The PEOPLE of the State of Colorado, Complainant,

v.

Declan J. O'DONNELL, Attorney–Respondent.

No. 97SA469.

Supreme Court of Colorado, En Banc.

Feb. 23, 1998.

Linda Donnelly, Disciplinary Counsel, John S. Gleason, Deputy Disciplinary Counsel, Kenneth B. Pennywell, Assistant Disciplinary Counsel, Denver, for Complainant.

Declan J. O'Donnell, Pro Se.

PER CURIAM.

The complainant and the respondent in this lawyer discipline case submitted a thirty-two page stipulation, agreement, and conditional admission of misconduct. See C.R.C.P. 241.18. The conditional admission recommended that the respondent receive a private or public censure. An inquiry panel of the supreme court grievance committee approved the conditional admission, and recommended a public censure. We accept the conditional admission and publicly censure the respondent.

## I.

The respondent was admitted to the Colorado bar in 1965. The conditional admission attempts to resolve three separate formal complaints filed against the respondent, Nos. GC 94A–10, GC 94A–105, and GC 97C–20. Each complaint will be addressed in turn.

## II. GC 94A–10

### A. The York Matter

In the spring of 1990, Don L. York answered an advertisement in an oil industry newspaper which read, "Oil Industry Equity Funding ... $4,000,000 minimum." The ad was placed by Diversified Financial, a Texas company owned by Gordon Smedley, who put York in contact with the respondent.

York owned a majority interest in and operated an oil refinery, and he wanted $60,-000 to pay off a loan and $1,600,000 to fund letters of credit to guarantee crude oil purchases. The respondent told York that it would be easy for the respondent to raise funds because of his access to over 5,000 investors. On May 16, 1990, York, as chairman and CEO of Western Refining Company, Inc., signed a fee agreement retaining the respondent's services. The agreement states that the respondent is cross-registered with the World Bar Association because of his firm's national and international client base. It also refers to the respondent as "special counsel," "financial advisor," and "underwriting consultant." The agreement is unclear, however, whether it is for a fixed fee amount

or an hourly fee. It states: "If there is no fixed fee arrangement, then the hourly rate fees will apply." The hourly fees are listed as $250 for the respondent; $150 for other attorneys; and $75 for paralegals. The agreement also provides for additional fees and expenses to be paid out of any proceeds of the offering at closing, at which time an additional legal fee of 2% would be charged. Moreover, the agreement requires extra compensation in the form of 2% of Western Refinery's common stock for underwriting, a service to be provided by the respondent or others.

York paid the respondent $35,000. The respondent's fee was $20,000; $5,000 was for the respondent's costs; and $10,000 was for Gordon Smedley's services as an expert in the oil industry to assess York's proposals and assets for funding possibilities.

In a letter to York dated June 19, 1990, the respondent indicates that his main activity is raising capital, and suggests that, because he represents over 500 limited partnerships in oil well deals, their "best play" would be to buy oil wells and trade their crude for pipeline crude at their refineries.

On July 23, 1990, the respondent made his first contact, concerning York's needs, with William (Liam) Hutchinson. Hutchinson was to assist in the fund-raising because he had the necessary bridge loan sources.[1]

York's monetary needs never exceeded $2,500,000 although the respondent insisted that York attempt to borrow $8,000,000 for the retirement of loans, new equipment, and operating capital. Because the respondent's agreement charged 2% of gross proceeds, the respondent created a situation where it could reasonably be foreseen that his own financial interest would affect his professional judgment.

The respondent kept a rough estimate of the work he performed and time he expended. These hours were tallied and recorded at the end of the month. After York discharged the respondent, he received a letter from the respondent on December 5, 1990, in which the respondent justified the $20,000 fee. On December 13, he submitted an itemized billing that indicated that between May 16 and December 13, 1990, the respondent earned $36,187.50, which was more than the $20,000 York paid him. The conditional admission states that these fees were arguably excessive because of the respondent's inexperience in acquiring bridge loans. He was unfamiliar with bridge loans in the oil industry and thus lacked the knowledge to procure the funding, especially since the client had filed for bankruptcy in Texas. No funding was ever obtained for York. The conditional admission indicates that although the respondent did perform substantial legal services on York's behalf, he reimbursed York $4,000 as part of the stipulation.

The respondent admitted that the foregoing conduct, which occurred prior to the effective date of the Rules of Professional Conduct, January 1, 1993, violated DR 2–106(A) (entering into an agreement for, charging, or collecting an illegal or clearly excessive fee); DR 5–101(A) (accepting employment if the exercise of the lawyer's professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own interests); and DR 6–101(A)(2) (handling a legal matter without adequate preparation under the circumstances).[2]

### B. The St. Clair Matter

In the spring of 1990, Randy E. St. Clair answered the same Diversified Financial advertisement described in the previous section. Smedley put St. Clair in contact with the respondent. St. Clair needed a bridge loan of $500,000 to purchase the property on which one of his oil leases was located because the owners were scheduled to go into bankruptcy within thirty days. St. Clair hired the respondent to structure an equity raise among limited partners to put his business on a long-term, financially feasible base. The respondent told St. Clair, as he had York, that funding would be easy to obtain

---

1. See footnote 5 below regarding Hutchinson's trustworthiness.

2. As part of the conditional admission, the complainant requests that the additional charge of misrepresentation in violation of DR 1–102(A)(4) be dismissed.

because of his access to more than 5,000 investors.

On June 25, 1990, the respondent and St. Clair signed essentially the same fee agreement that York had signed. The agreement also stated the urgency involved in obtaining the funds. The respondent first contacted Liam Hutchinson regarding the St. Clair matter in July, and an engagement letter to Hutchinson concerning St. Clair is dated July 25, 1990.

As in the agreement with York, the respondent's fee agreement is unclear whether it is for a fixed fee or an hourly fee. In the St. Clair agreement, the respondent is to receive a 2% overriding royalty on the project for underwriting and a 10% finder's fee for the bridge loan. The respondent's subsequent request for a 3% overriding royalty was rejected by St. Clair.

The respondent estimated the time spent on the St. Clair project the same way as in the York matter. St. Clair paid the respondent $25,000—$20,000 as a fee and $5,000 for costs. St. Clair separately paid Smedley $15,000.

St. Clair originally sought a $500,000 bridge loan, but the respondent suggested he try to borrow $900,000. Because the respondent was to receive a percentage of the gross proceeds, his own financial interest could have affected his professional judgment. The respondent was unfamiliar with the specific bridge loan aspects involved and he lacked the knowledge needed to obtain such funding. St. Clair never received the funds he needed.

After being terminated by St. Clair, the respondent justified his fee by representing that he performed $8,875 over what he had been paid. Because of the respondent's inexperience in obtaining bridge loan funding in the oil industry, however, his fee was excessive. As a condition of the stipulation, the respondent returned $6,000 to St. Clair.

The respondent's conduct violated DR 2–106(A) (entering into an agreement for, charging, or collecting an illegal or clearly excessive fee); DR 5–101(A) (accepting employment if the exercise of the lawyer's professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own interests); and DR 6–101(A)(2) (handling a legal matter without adequate preparation under the circumstances).[3]

### C. Patrick C. McNamee

On June 2, 1992, Patrick C. McNamee sent the respondent $2,700 in answer to an advertisement. In this advertisement, the respondent suggested to investors that they should retain individual counsel regarding a tax shelter program that had been disallowed by the Internal Revenue Service. McNamee was such an investor. The fee schedule in the advertisement required $2,500 as half of the fixed fee retainer and $200 as an annual fee in lieu of expenses.

On June 23, 1992, McNamee telephoned the respondent and told him that he had decided to discontinue the respondent's services. He asked the respondent to stop all work and requested a complete refund, and the respondent said he would refund the money. However, on August 13, 1992, the respondent's staff told McNamee that because the respondent had already filed an entry of appearance he would not be able to refund the $2,700 until the Tax Court authorized the respondent to withdraw.

The respondent indicates that he sent his co-counsel in Las Vegas the entry of appearance form to be countersigned and then filed with the Tax Court. Co-counsel never filed the entry of appearance, but the respondent was not aware of this.

Having not received a refund, on September 21, 1992, McNamee filed a request for investigation with the Office of Disciplinary Counsel. The respondent's November 5 response to the request stated that he was preparing a detailed disclosure certificate on withdrawal which he believed was "mandated under the facts of this case." Once this certificate was completed and filed, he would be able to determine the amount of the re-

---

**3.** As in the York affair, the complainant requests that the charge that the respondent violated DR 1–102(A)(4) be dismissed.

fund which McNamee would be entitled to after deducting the fees incurred in preparing the certificate.

On December 30, 1992, the respondent sent a motion of withdrawal to his co-counsel, without the disclosure certificate, and it was returned. He sent a motion to withdraw to the Tax Court on January 14, 1993, and it was also returned because no entry of appearance had been filed. On February 10, 1993, he sent a revised motion to withdraw, not including a disclosure certificate, to co-counsel for signature and filing. The respondent did prepare an elaborate (and unnecessary) disclosure certificate which was never filed, but was included in a memorandum the respondent sent his clients in an effort to dissuade them from discharging him. He finally sent a $2,500 check in a letter to McNamee on February 22, 1993, stating that the check was an exception to his strict policy against giving refunds. The $200 annual fee was not returned.

As the respondent admitted, the foregoing conduct, which occurred both before and after the effective date of the Rules of Professional Conduct, violated DR 6–101(A)(2) (handling a legal matter without adequate preparation under the circumstances); as well as DR 9–102(B)(4) and Colo. RPC 1.15(b) (failing to deliver funds or other property that the client is entitled to receive).

### D. The Tax Defense Group

The respondent represented Richard Hartmann in a 1987 Tax Court case involving Drake Oil Technology Partners. In 1991, the respondent's office began soliciting Hartmann to join a "Tax Defense Group" to pursue separate proceedings for a refund of taxes paid on other disallowed tax shelters. The initial charges were a $500 administrative fee to enroll, and a $200 annual maintenance fee. When litigation began, an invoice for $2,500 would be sent to the client with pleadings for the client to review. Hartmann sent the respondent a check for the $200 maintenance fee on April 23, 1992, and shortly thereafter, Hartmann received a bill for $2,500, but no pleadings were enclosed.

When he called the respondent's office, they told Hartmann that the fee schedule for the Tax Defense Group did not apply to him, and he was provided with a new fee agreement. The respondent's paralegal confirmed this in a letter to Hartmann dated May 28, 1992. Hartmann then received a second invoice, without pleadings, for $2,500 plus a late interest charge of one-and-one-half percent.

Hartmann decided not to join the Tax Defense Group and in a letter dated June 6, 1992, he asked for a refund of his $200. Receiving no reply, he telephoned the respondent's paralegal and was promised that his $200 would be refunded. No check was sent, but Hartmann received a third invoice dated August 1, 1992, for $2,500 plus an additional interest charge. When Hartmann called again, the respondent's paralegal referred him to another person who suggested he review a recent Tax Court decision before insisting on a refund. He reviewed the decision, but he still wanted the refund and was promised on August 18 that the check would be mailed the next day. It was not, and when Hartmann's call was returned on August 26, the respondent threatened to withdraw from representing Hartmann in all his legal matters. The respondent told him that he would compute his hours and send Hartmann a bill, and then he hung up.

On September 1, 1992, Hartmann filed a request for investigation with the Office of Disciplinary Counsel. On October 6, 1992, the same date as on his response to the request for investigation, the respondent mailed Hartmann a refund of $200.

By failing to return Hartmann's $200 until after the request for investigation was filed against him, even though no work was performed on Hartmann's behalf, the respondent again violated DR 9–102(B)(4) (failing to deliver funds or other property that the client is entitled to receive).[4]

### III. GC 94A–105

#### A. Leather Stocking High Voltage

The respondent represented Liam Hutch-

---

4. The complainant asks that the allegation that the respondent violated DR 2–106(A) (charging an excessive fee) be dismissed because it cannot be proved.

inson in various business ventures.[5] Hutchinson was a business promoter and president of American Cattle Management Corporation (ACMC), which was the general partner in Leather Stocking High Voltage, a limited partnership. In August 1985, Leather Stocking purchased a prize-winning Angus bull and the bull's semen from American Cattle Breeders. With the respondent's assistance, Hutchinson planned to establish limited partnerships to market embryos produced with the bull's sperm. However, problems between ACMC and American Cattle Breeders arose and the latter brought a replevin action against Leather Stocking in Larimer County District Court. Various investors pulled out of the embryo program in late 1985, and the respondent and Hutchinson discussed other financing alternatives. A Portland, Oregon entity offered funding for Hutchinson's venture, but required Hutchinson to put up promissory notes from his investment partners as collateral. Because a third party was required to handle the transfer of the promissory notes, the respondent suggested St. Joseph's Credit Corporation as the escrow agent. Coincidentally, the respondent's family trust was the sole owner of St. Joseph's, as Hutchinson knew. Nevertheless the respondent failed to disclose to Hutchinson that his family's ownership of the credit corporation could affect his representation of Hutchinson, thereby violating DR 5–101(A). The conditional admission states that there is no evidence of harm since Hutchinson ultimately rejected the Portland offer.

In 1986, Albright and Associates brought an action against an officer of ACMC for expenses that had not been paid. The officer brought a cross-claim against ACMC and Hutchinson personally. The respondent filed an answer on behalf of ACMC and Hutchinson and he was ordered to file a trial data certificate by July 17, 1987. The respondent failed to do so and opposing counsel filed a motion to strike Hutchinson's answer and requested entry of judgment against Hutchinson. Ultimately a default judgment in the amount of $162,671.60 was entered against Hutchinson. The respondent would testify that Hutchinson had no viable defense, was judgment-proof, and did not expect the respondent to set forth a defense. Hutchinson has not paid any amount on the default judgment. The respondent admits that his failure to file the appropriate documents constitutes neglect of a legal matter, contrary to DR 6–101(A)(3).

### B. The Letter

In 1989, federal criminal charges were brought against Hutchinson for securities and mail fraud. The charges included that Hutchinson had misled investors regarding his bull sperm and embryo program. The respondent had written a letter in February 1986 which was purportedly sent to Hutchinson that questioned the accuracy of several statements in Hutchinson's résumé, which was included with some of the limited partnership offerings in the cattle breeding partnership. The letter suggests that Hutchinson misrepresented his qualifications. The conditional admission indicates that the letter was a draft which was never sent to Hutchinson. A proposed investor somehow did have a copy of the letter and he gave it to the FBI and the federal prosecutor. Hutchinson was convicted and sentenced to the federal penitentiary. The federal prosecutor states that the letter was not crucial in the trial and was not introduced in evidence, but it was used in the respondent's cross-examination. The respondent stipulates that his failure to safeguard the letter violated DR 4–101(B)(1) (knowingly revealing a confidence or secret of the lawyer's client).

### IV. GC 97C–20

David Bershof became a limited partner in the Vulcan Oil Technology Partnership on December 22, 1981. He paid his first three subscription amounts totaling $37,500 by 1983. The subscription agreement required subsequent investments totaling $112,500 for 1994 through 1996. Bershof did not make these payments. Bershof did claim certain tax deductions for 1981–1984 which were dis-

---

**5.** The complainant states that although Hutchinson is the complaining witness in GC 94A–105, he "is a twice convicted felon incapable of providing honest or credible testimony." Therefore, the complainant "did not rely on any evidence independently provided by Mr. Hutchinson."

allowed by the IRS. Bershof and his lawyer (not the respondent) reached a settlement in 1986 whereby Bershof was prohibited from making future challenges of the tax assessment if the partnership was subsequently upheld by the Tax Court.

The general partner of Vulcan hired the respondent to represent Vulcan and six other limited partnerships of which he was the general partner and which constituted the Oil Technology Group (OTG). The tax benefits of these limited partnerships had been challenged by the IRS. The respondent's job was to reorganize the underlying limited partnership structure and to defend OTG before the United States Tax Court. The respondent's fee was $100,000 per limited partnership, a total of $700,000.

The respondent sent a letter to the limited partners stating that for a fixed fee of $500 per unit of investment and $100 for costs, he would represent the individual limited partners on a "group defense" basis. Bershof's lawyer wrote to the respondent on June 2, 1987, stating that Bershof would be forwarding his $600 shortly, and that Bershof had been audited by the IRS and had entered into a settlement agreement that prohibited a challenge of the tax assessment. Bershof's attorney asked the respondent if the $600 fee included challenging the individual IRS settlements like Bershof's. The respondent failed to answer or even acknowledge the lawyer's inquiries about the IRS settlement on two separate occasions. Bershof subsequently sent the respondent the $600 to join the tax defense group. In July 1988, the respondent reported to the limited partners that his firm represented over 600 units out of a total 1,200 units involved in the seven limited partnerships.

A class action suit was filed in 1988 in the United States District Court for Northern California alleging fraud against accountants and other professionals involved in establishing the limited partnerships. In 1989, the limited partners decided to liquidate.

In November 1992, the respondent filed an action against OTG and others asserting that the defendant limited partnerships had only paid him $350,000 of the $700,000 agreed to. The general partner failed to file an answer and the respondent obtained a default judgment in April 1993 for $805,250.27.

On August 10, 1993, the federal district court entered permanent injunction orders in the class action suit enjoining the limited partnerships and their attorneys and representatives from taking any action to enforce the subscription agreement obligations entered into by the limited partners. Nevertheless, on January 13, 1995, the respondent began garnishment proceedings in the District Court for the City and County of Denver against Bershof and other limited partners to collect the respondent's default judgment. He sought to compel the limited partners to make their unpaid subscription agreement payments of $111,250, as evidenced by notes due the limited partnerships in 1994 and later. Between January and March 1995, Bershof unsuccessfully litigated his obligation to pay anything to the respondent, so he finally settled the matter by paying the respondent $8,500. As a result, Bershof's garnishment was vacated. On August 16, 1995, however, the Denver District Court vacated its earlier orders and prohibited the respondent from pursing garnishment proceedings against the limited partners because of the federal district court injunction.

The respondent engaged in a conflict of interest in his collection activities against Bershof and at least three other limited partners because they believed that the respondent was still their attorney with respect to the OTG matter since the respondent had never advised them otherwise. He thereby violated DR 5–105(B) (continuing multiple employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or would be likely to involve him in representing different interests). In addition, by failing to respond to Bershof's lawyer's inquiries regarding the IRS settlement, the respondent violated DR 6–101(A)(3) (neglecting a legal matter). The respondent recently refunded $1,000 of the $8,500 Bershof paid him as compensation for

the costs he expended as a result of the respondent's collection activities.[6]

## V.

The inquiry panel approved the conditional admission and recommended a public censure. The complainant advocates a public censure and the respondent asserts a private censure is adequate.

The respondent's misconduct falls in three general areas: charging and collecting excessive fees; failing to promptly return unearned advance fees; and conflicts of interest. Under the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) (ABA *Standards*), in the absence of mitigating or aggravating factors, public censure "is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system." *Id.* at 7.3. Charging an excessive fee is such a violation. *See People v. Sather*, 936 P.2d 576, 579 (Colo.1997). A private censure is not appropriate because this case involved more than "an isolated instance of negligence." *Cf. id.* at 7.4.

Regarding the failure to promptly refund unearned fees, a public censure is generally warranted "when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client." *Id.* at 4.13. On the other hand, a private censure "is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client." *Id.* at 4.14.

Most serious is the respondent's failure to perceive or warn his clients against conflicts of interest arising from multiple employment or the respondent's own personal interests. This failure runs through four of the seven counts of misconduct above. "Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." *Id.* at 4.32; *see People v. DeRose*, 945 P.2d 412, 415 (Colo.1997) (misconduct involving multiple instances of the lawyer's investing his client's funds for the benefit of his friends and relatives, as well as neglecting and handling legal matters without being adequately prepared warranted three-year suspension); *People v. Banman*, 901 P.2d 469, 471–72 (Colo.1995) (charging excessive fees for managing his client's business, failing to provide appropriate accountings, entering into business transactions with his clients without revealing conflict of interest, and handling legal and investment matters in which the lawyer did not have experience warranted three-year suspension despite the absence of previous discipline); *see also People v. DeLoach*, 944 P.2d 522, 523 (Colo. 1997) (communicating with client's co-defendant in first-degree murder case without knowledge or consent of co-defendant's lawyers warranted thirty-day suspension).

Admittedly, the misconduct in this case is less serious than in either *DeRose* or *Banman*, and the actual harm caused is minimal. Nevertheless, it is a close question whether a public censure is an adequate sanction, especially given the fact that the respondent has previously been admonished on two occasions, *see* ABA *Standards* 9.22(a) (previous discipline is an aggravating factor for the purposes of determining the proper level of discipline). There is also the presence of a selfish motive in the York and St. Clair matters, *see id.* at 9.22(b); a pattern of misconduct, *see id.* at 9.22(c); the presence of multiple offenses, *see id.* at 9.22(d); and the respondent has substantial experience in the practice of law, *see id.* at 9.22(i). In mitigation, the conditional admission tells us that the respondent did not have a dishonest motive, *see id.* at 9.32(b); he has made full and free disclosure in the disciplinary proceedings, *see id.* at 9.32(e); other penalties or

---

**6.** As part of the conditional admission, the complainant requests that additional charges of violations of DR 1–102(A)(4) (engaging in misrepresentation), DR 2–101(E) (engaging in prohibited solicitation), DR 5–105(A) (failing to decline proffered employment when it would involve the lawyer in representing differing interests), and Colo. RPC 8.4(d) (engaging in conduct prejudicial to the administration of justice), be dismissed as they cannot be proved by clear and convincing evidence.

sanctions have been imposed on the respondent, *see id.* at 9.32(k); and the respondent has expressed remorse, *see id.* at 9.32(*l*). We have decided to accept the conditional admission and the recommendation of the inquiry panel. Some members of the court, however, would have rejected the conditional admission because the recommended discipline was too lenient, and would have sent the case back to the grievance committee for further proceedings.

## VI.

Accordingly, Declan J. O'Donnell is hereby publicly censured. It is ordered that the respondent pay the costs of this proceeding in the amount of $1,942.43 to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202–5135, within thirty days after the announcement of this opinion.