The PEOPLE of the State of Colorado, Complainant

v.

John W. DALTON, Respondent.

No. 15PDJ037.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Jan. 15, 2016.

## OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)

### I. *PROCEDURAL HISTORY*

On May 22, 2015, Erin R. Kristofco, Office of Attorney Regulation Counsel ("the People"), filed a complaint against Respondent, alleging he violated Colo. RPC 1.5(a), 1.5(b), and 4.1(a). Respondent answered the complaint on June 15, 2015.[1] In his answer, Respondent asserted five counterclaims

against the People and sought $1,000,000.00 in damages based on their "attempt to extort" him.[2] Presiding Disciplinary Judge William R. Lucero ("the PDJ") dismissed Respondent's counterclaims on July 30, 2015. The PDJ then held a scheduling conference on August 6, 2015, setting the disciplinary hearing for November 12, 2015.

During a status conference on September 30, 2015, Respondent announced that he intended to call Kristofco as a witness at the disciplinary hearing to show that she had conspired with a witness and engaged in criminal conduct. The PDJ denied Respondent's request, finding that Kristofco's testimony would be irrelevant to the claims alleged in the complaint. On October 21, 2015, the PDJ granted the People's request to present the absentee testimony of Julie Kersting and Mona Bellantonio.

On November 12, 2015, a Hearing Board comprising Luke J. Danielson and David A. Helmer, members of the bar, and the PDJ held a hearing pursuant to C.R.C.P. 251.18. Kristofco represented the People, and Respondent appeared pro se. During the hearing, the Hearing Board considered testimony from James Foreman, Corrine Rash, Mona Bellantonio, and Respondent.[3] The PDJ admitted stipulated exhibits S1–S14 and the People's exhibit 15.

### II. *FINDINGS OF FACT AND RULE VIOLATIONS*

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 6, 1975, under attorney registration number 06945. He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this disciplinary proceeding.[4]

The Hearing Board finds that the following facts were established by clear and convincing evidence. Where not otherwise indicat-

---

1. Respondent amended his answer on September 8, 2015, because he had inadvertently failed to respond to paragraph 71 of the People's complaint. The PDJ accepted his amended answer.

2. Answer at 5.

3. The People intended to call Julie Kersting to testify by telephone, but she was ill and thus unable to testify.

4. *See* C.R.C.P. 251.1(b).

ed, these facts are drawn from testimony provided at the hearing.

## Findings of Fact

This case centers on Respondent's representation of James Foreman ("Foreman") in 2012 and 2013. Respondent is a solo practitioner in Buena Vista who employs Michol Foreman ("Michol") as his assistant. Foreman—Michol's relative by marriage—is a retired mechanic who is now seventy-four years old.

Foreman's mother, Leah A. Thompson, passed away in 2011. Medicaid, through Health Management Systems, Inc. ("HMS"), notified Foreman in February 2012 that it had a claim against Thompson's estate for her nursing home care.[5] The estate's primary asset was Thompson's home in Buena Vista, and the sole heirs were Foreman and his sister. After Thompson's death, Foreman and his daughter Corrine Rash met with Julie Kersting, a local realtor, to discuss selling Thompson's house. Kersting performed a fair market analysis of the property, estimating that it was worth $150,000.00.

In July 2012, Foreman asked Respondent to probate his mother's estate and to negotiate a settlement of the Medicaid claim. Foreman brought Rash to help during this meeting because he is hard of hearing. Rash explained that she has long acted as a kind of "secretary" for her father.

Foreman and Rash, both of whom the Hearing Board found generally credible, recall Respondent saying that his legal fees would be at least $5,000.00. Rash's contemporaneous notes, which state "5K no less for Dalton," corroborate this testimony.[6] Respondent, on the other hand, testified that he and Foreman agreed to a flat fee of $12,000.00, based on an hourly rate of $250.00. In Respondent's view, he was in fact giving Foreman a "break" because he was related to Michol. Respondent admits

he never gave Foreman a written fee agreement or otherwise set forth his fee in writing.

Foreman and Rash both remember telling Respondent at their initial meeting that Kersting should be the listing agent for Thompson's home. According to Rash, Kersting is "family" and has a good reputation. Respondent testified that he understood Foreman wanted to use his own real estate agent and that Respondent did not initially object to the decision.

Respondent filed the probate action, and Foreman was appointed as personal representative of the estate. HMS filed a probate claim in the amount of $90,767.59 to recover the cost of Thompson's nursing home care.[7]

The breakdown in Respondent's relationship with Foreman and Rash appears to have begun in August 2013, after Respondent filed a notice disavowing HMS's lien and sent HMS a settlement offer.[8] The offer listed a sales price of $125,000.00 for Thompson's home, a 10% real estate commission, and attorney's fees of $8,500.00.[9] The offer estimated net proceeds of $102,000.00, to be split evenly three ways among Foreman, his sister, and HMS.[10]

Respondent testified that he listed attorney's fees in the amount of $8,500.00 in the offer because he needed to give HMS a specific number, and even though he had not created an itemized statement, he "knew how much time we had in it." The 10% commission and sale price of $125,000.00, meanwhile, appear to reflect Respondent's communication with Mona Bellantonio, another local real estate agent. By the time Respondent extended the offer of settlement, Bellantonio had performed her own fair market analysis of the Thompson house at Respondent's behest.

Respondent and Bellantonio both testified in some detail about the 10% commission. Bellantonio does not have a set commission

---

5. Ex. S5 at 000111. Technically, the Colorado Department of Health Care Policy and Financing paid for Thompson's care, but that department generally was referred to as "Medicaid" during the Foreman representation.

6. *See* Ex. S1.

7. *See* Ex. S5 at 000111.

8. Ex. S2.

9. Ex. S2 at 000040.

10. Ex. S2 at 000040.

of 10%. Rather, Respondent and Bellantonio testified that Respondent fixed a commission of 10% to hasten the sale of Thompson's house by motivating brokers to show the house. According to Respondent, the Buena Vista real estate market was depressed at the time, and local properties were not fetching high prices. Since real estate agents have to split commissions multiple ways, Respondent said, a house valued under $200,000.00 needs a significant commission to drive agent interest and effect a prompt sale—an important consideration when an estate is being probated. Indeed, Bellantonio testified that she had worked on several estate matters with Respondent before, each time drawing a 10% commission.

Foreman and Rash testified that Foreman never saw Respondent's settlement offer or discussed the terms with him, including the sale price, attorney's fees, and real estate commission.

HMS responded to Respondent's offer on August 26, 2013, largely accepting the proposal.[11] Michol then asked Foreman to immediately come to Respondent's office to sign a document—apparently a working draft of a settlement agreement. Foreman says he was presented with a blank piece of paper to sign, and Michol told him the information would be filled in later. Foreman recalls Respondent mentioning at this time that the house had been valued at $125,000.00, but when Foreman brought up the separate valuation of $150,000.00, Respondent dismissed his concern, leading him to believe that the house would still be listed at $150,000.00.[12] Foreman was not given a copy of the document he signed at the time.

Soon thereafter, Michol delivered a completed settlement agreement to Foreman, which contained the page he had signed. The document listed a 10% real estate commission, a sale price of $125,000.00, and Bellantonio as the listing agent. Foreman was

upset because he had told Respondent that he wanted to use Kersting, and Kersting's commission was 5%. Foreman threw the document away in anger and asked Rash to call Respondent to express his displeasure. Rash recalls that she and her father were upset because they thought that, as an attorney, Respondent "was supposed to be ... like, for us, like helping us; and it seemed like he was ... not for us and [was] angry that we were not just doing what he said because of wanting to use our own realtor."

Rash told Michol that her father intended to use Kersting as the listing agent. Rash remembers Michol responding that Respondent would be angry and would no longer want to represent Foreman because he viewed Kersting as "bossy."

Within several days, Foreman, without discussing the matter with Respondent, signed a contract for Kersting to sell his mother's house. The contract called for a 5% commission and a listing price of $150,000.00. When Rash informed Respondent about the contract, he sent Foreman a letter withdrawing as counsel on September 4, 2013.[13] Respondent wrote that Rash had "inserted herself in this matter" and that he would "not work for [Rash] or her cronies."[14] He remarked that the "estate does not have leisure to shop for realtors" and that Foreman needed new counsel "to convey a property with a huge defective title."[15] Respondent also contended that Foreman had "diluted [his] authority."[16]

Foreman was puzzled by Respondent's reference to a defective title, since Kersting had told him there were no title problems. Ultimately, before it sold, the house passed inspection with a clean title search.[17] Respondent testified that his comment about a defective title referred to the Medicaid lien and that in his experience, a lien effectively constitutes a title defect. Respondent also explained that he withdrew from the repre-

---

11. Ex. S3.

12. Rash's testimony about what Foreman contemporaneously related to her about this visit jibed with Foreman's own recollections.

13. Ex. S4.

14. Ex. S4.

15. Ex. S4.

16. Ex. S4.

17. The house sold for $139,000.00.

sentation because Foreman and Rash did not consult with him about signing the contract with Kersting and because he did not want Rash acting as an "intermediary" between him and Foreman.

After Respondent withdrew, Foreman had Rash contact HMS to determine how to move forward. HMS responded that it would honor the agreement to split the proceeds equally among HMS, Foreman, and Foreman's sister. Foreman decided to proceed without hiring new counsel. The parties filed a stipulation containing these terms as well as a $150,000.00 sale price and a 5% commission,[18] and the court approved the settlement.

In October, Respondent sent Foreman a bill for $8,000.00. The bill provided no detail about how Respondent calculated his fees, so Foreman requested an itemized statement.[19] Around this time, Foreman and Rash lodged a grievance against Respondent.

On November 8, 2013, Respondent sent Foreman a letter stating that he was filing a claim against the estate for the "agreed upon flat fee" of $8,000.00 and that "[a]s you now require an itemized statement I would hope you expect me to amend my claim reflecting the true cost." [20] Rash and Michol exchanged a series of text messages.[21] In the messages, Michol informed Rash that she was "working on the itemized statement but since [she] didn't write anything down when it was done [she was] having to go back and look up all the dates and stuff." [22] Respondent denies having asked Michol to "recreate anything," saying he merely requested that she create a bill using the logs from the case.

Respondent then sent Foreman a detailed invoice claiming attorney's fees of $9,970.00. Yet on January 2, 2014, Respondent filed a petition for allowance of claim in the probate matter, asserting a claim of $8,000.00 in legal fees.[23] He testified that he asked for $8,000.00 because he "figured [he] was safe with this number." As of the date of the disciplinary hearing, Foreman had not paid Respondent. Foreman does not dispute that he owes Respondent money—perhaps as much as $8,000.00—but he wants to understand how Respondent calculated his fees.

After the People initiated their investigation of Respondent, he sent them a letter in February 2014 defending his actions in the Foreman representation and stating, among other things, that Thompson's house lacked a foundation.[24] At the disciplinary hearing, Bellantonio testified that when she visited Thompson's home, she noticed that the siding extended all the way to the ground and no foundation was visible. She was concerned that the house might lack a foundation, and she thought an engineer should be hired to examine the house.

Respondent sent the People another letter in July 2014 alleging that Rash was "practicing law without a license, committing elder abuse, tortuously [sic] interfering with lawyer/client relations, and stealing my work product." [25] He suggested that the People were engaging in "corruption and cronyism" and averred that he was "liquidating [his] assets and plan[ned] to close down." [26] In another missive, sent in March 2015, Respondent charged that the People had engaged in "extortion," "treat[ed him] like shit," and "actively engaged in a criminal conspiracy." [27] He further alleged that Rash was a "thug" who had "hijacked" and was "looting" Foreman's estate.[28]

18. Ex. S5. Unlike Respondent's proposed offer, the stipulation also accounted for Foreman's expenses in maintaining his mother's property. Ex. S5 at 000112.

19. Ex. S6.

20. Ex. S7.

21. Ex. S8. Rash's responses are highlighted in yellow in this exhibit.

22. Ex. S8.

23. Ex. S9.

24. Ex. 15.

25. Ex. S10.

26. Ex. S10.

27. Ex. S11.

28. Ex. S11. Respondent's allegations regarding extortion were echoed in a fourth letter sent in April 2015. Ex. S13.

At the disciplinary hearing, Respondent defended the language in these letters, saying that "I tell it as it is" and that he genuinely views Rash as a thug. Foreman, meanwhile, painted a very different and favorable portrait of Rash as a daughter committed to assisting her aging parents, and no evidence was presented to the Hearing Board to corroborate Respondent's accusations.

## Rule Violations

As noted above, the People allege that Respondent violated Colo. RPC 1.5(a), 1.5(b), and 4.1(a). We first consider the People's claim that Respondent transgressed Colo. RPC 1.5(b) by failing to explain his fee in writing. According to this rule, "[w]hen the lawyer has not regularly represented the client, the basis or rate of the fee and expenses shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation." [29]

Here, it is undisputed that Respondent had not previously represented Foreman, yet he did not timely explain in writing how he would calculate his fee. The Hearing Board therefore has no trouble concluding that Respondent violated Colo. RPC 1.5(b).

We next turn to the People's allegation that Respondent charged an unreasonable fee in violation of Colo. RPC 1.5(a). The People premise this claim on several facts, including that Respondent identified his legal fee as $8,000.00 in one instance and $9,970.00 in another instance. Further, the People say that Respondent's fee was unreasonable because he inserted a 10% real estate commission into the settlement offer even though no real estate agent had requested that commission. The People also allege that Respondent's fee was unreasonable because he set the 10% commission in his settlement offer without consulting Foreman and because he told Foreman to sign the settlement offer without discussing the 10% commission with him.

The Hearing Board does not agree that Respondent's fee was unreasonable. There is no evidence that $8,000.00 or $9,970.00 was an excessive fee for the work Respondent performed, and we have already accounted for the ambiguity of Respondent's fee under the rubric of Colo. RPC 1.5(b). As for the commission, Respondent and Bellantonio provided persuasive testimony that a 10% real estate commission was reasonable—even if other agents were willing to accept a lower fee—because a 10% commission might help spur a sale. This reasoning does not appear illogical, and no evidence was introduced to gainsay this testimony. Moreover, the commission that Respondent fixed was remuneration for the real estate professionals involved in the sale, not a legal fee or legal expense, and it thus is not a proper subject for a Colo. RPC 1.5(a) claim.[30]

We also decline to rule that Respondent violated Colo. RPC 1.5(a) by failing to consult with Foreman about the settlement offer. We do credit Foreman's and Rash's testimony that Respondent did not adequately communicate with Foreman about the terms of the proposed settlement; Foreman was unquestionably taken by surprise when he reviewed the completed settlement agreement. But this lack of communication has no bearing on the reasonableness of Respondent's own legal fees or expenses, which are the relevant issues under Colo. RPC 1.5(a). Therefore, an allegation of inadequate communication under Colo. RPC 1.4, rather than a Colo. RPC 1.5(a) claim, might have been more appropriate to the facts at hand.

The People's final claim alleges that Respondent violated Colo. RPC 4.1(a), which prohibits a lawyer, in the course of representing a client, from knowingly making a false statement of material fact or law to a third person. Specifically, the People contend that Respondent knowingly misrepresented to Foreman and Rash that Thompson's property had a "huge defective title" and knowingly misrepresented to the People

29. Colo. RPC 1.5(b).

30. *See* Colo. RPC 1.5 cmt. 1 (indicating that the expenses addressed in Colo. RPC 1.5(a) are the lawyer's own expenses, such as copying costs and telephone bills).

in his February 2014 letter that the house lacked a foundation.

The People have not adduced clear and convincing evidence to support either basis for the charge. First, Respondent credibly testified that in his forty years of real estate practice, he has understood a lien upon a house to effectively amount to a cloud on its title. Although a lien may not be strictly synonymous with a defective title, the Hearing Board has no basis for finding that these terms are not used interchangeably in practice. We therefore do not find clear and convincing evidence that this statement was false or that Respondent knew it was false.

Second, Bellantonio testified that she was concerned, based on her visual assessment of the Thompson house, that it lacked a foundation. The concerns of Bellantonio—a seasoned local real estate agent—provided Respondent a reasonable basis to believe that the house indeed lacked a foundation. We thus cannot find that he made a knowing misrepresentation to the People.

### III. SANCTIONS

The American Bar Association *Standards for Imposing Lawyer Sanctions* ("ABA *Standards*")[31] and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[32] When imposing a sanction after a finding of lawyer misconduct, a hearing board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* An improper fee arrangement is considered a violation of a lawyer's duty as a professional under the ABA *Standards*.[33]

*Mental State:* The requirement that lawyers explain the basis of their fee in writing is a longstanding and straightforward principle of Colorado law. Indeed, Respondent did not disavow knowledge of this requirement. We find that Respondent knowingly disregarded this rule.

*Injury:* Respondent's failure to set forth his fee in writing caused Foreman considerable confusion. Moreover, much of the conflict that ensued when the representation ended—perhaps even this disciplinary proceeding—might have been avoided if Respondent had simply put his fee in writing at the outset.

### ABA *Standards* 4.0–7.0—Presumptive Sanction

ABA *Standard* 7.3 provides that public censure is generally appropriate when a lawyer negligently commits misconduct that violates a duty owed as a professional, causing injury or potential injury, while ABA *Standard* 7.2 provides that suspension is generally appropriate when the lawyer's violation of a professional duty is knowing. Here, we conclude that Respondent acted knowingly, but we find ABA *Standard* 7.3 to be the applicable presumptive sanction. Although the annotations to the ABA *Standards* do not directly speak to a lawyer's failure to set forth a fee in writing, the annotation to ABA *Standard* 7.3 states that "[c]ourts typically impose reprimands or censures when lawyers engage in a single instance of charging an excessive or improper fee,"[34] as the Colorado Supreme Court has likewise noted.[35] The charging of an improper fee is a form of misconduct closely related to failure to explain a fee in writing, and we therefore find this commentary relevant and persuasive. We also observe that the People identify

---

31. Found in ABA *Annotated Standards for Imposing Lawyer Sanctions* (2015).

32. *See In re Roose*, 69 P.3d 43, 46–47 (Colo. 2003).

33. ABA *Annotated Standards* at 367–69.

34. ABA *Annotated Standards* at 367.

35. *In re Wimmershoff*, 3 P.3d 417, 421 (Colo. 2000) (quoting the ABA *Standards* commentary and identifying ABA *Standard* 7.3 as the applicable presumptive standard for a single instance of charging an improper fee); *People v. O'Donnell*, 955 P.2d 53, 59 (Colo.1998) (holding that the charging of an excessive fee carries the presumptive sanction of public censure, at most).

ABA *Standard* 7.3, not ABA *Standard* 7.2, as the presumptive sanction for Respondent's violation of Colo. RPC 1.5(b).

## ABA *Standard* 9.0—Aggravating and Mitigating Factors

■ Aggravating circumstances include any considerations or factors that may justify an increase in the degree of the sanction to be imposed, while mitigating circumstances may warrant a reduction in the severity of the sanction.[36] Respondent did not introduce evidence of any mitigating factors at the disciplinary hearing. As set forth below, however, the Hearing Board has identified one mitigating factor, and we consider that factor along with three aggravating factors in deciding the appropriate sanction.[37]

*Prior Disciplinary Offenses—9.22(a)/Remoteness of Prior Offenses—9.32(m):* Respondent received a public censure in 1992. That matter involved the assertion of an ungrounded claim of liability against a complaining witness as well as the assertion of unwarranted allegations against a judge, prosecutor, and court reporter, amounting to conduct that was "undignified, discourteous and disruptive of the proceedings."[38] Respondent was also privately admonished in 1981 for similar conduct.[39] The remoteness of Respondent's past misconduct is a mitigating factor, however, so we thus apply little weight in aggravation to his prior discipline.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was licensed in 1975. He unquestionably qualifies as a longstanding practitioner who should have been well-habituated to setting forth his legal fees in writing.

36. *See* ABA *Standards* 9.21 & 9.31.

37. Although the People ask us to apply ABA *Standard* 9.22(g)—refusal to acknowledge wrongful nature of conduct—we decline to do so. Respondent candidly acknowledged at the disciplinary hearing that he should have given Foreman a written fee agreement.

38. Ex. S14 at 000007–08.

39. Ex. S14 at 000010.

40. *In re Rosen*, 198 P.3d 116, 121 (Colo.2008).

■ *Unprofessional Conduct:* The aggravating and mitigating factors identified in the ABA *Standards* "are expressly intended as exemplary and are not to be applied mechanically in every case."[40] Moreover, "matters ... relevant to a lawyer's fitness to practice or matters arising incident to the disciplinary proceeding" are proper considerations for a hearing board, according to the ABA *Annotated Standards*.[41] Here, we consider Respondent's unprofessional conduct toward Rash, Foreman, and the People as an aggravating factor. As professionals, lawyers have a duty to refrain from the type of noxious assailments Respondent unleashed against his client's daughter. Such attacks not only hurt the victims but also bring disrepute upon the legal profession. Respondent similarly failed to exercise self-restraint in the disciplinary investigation and proceeding; he made outrageous accusations against the People and he asserted grossly unfounded counterclaims, seeking damages in the amount of $1,000,000.00. Respondent's pattern of using sexist language is yet another example of conduct unbecoming a lawyer.[42] Given that this lamentable pattern continued both in the underlying representation and in the disciplinary process itself, this is an appropriate aggravating factor. One Hearing Board member, however, does not agree that Respondent's abrasive language should be considered in aggravation.

## Analysis Under ABA *Standards* and Colorado Case Law

■■ The Colorado Supreme Court has directed the Hearing Board to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors.[43]

41. ABA *Annotated Standards* at 414.

42. Among other things, Respondent made multiple uncomplimentary references to a "lady judge" at the disciplinary hearing. We note that all of the individuals with whom Respondent experienced conflict in the underlying representation and in this proceeding—Kersting, Rash, and Kristofco—are female.

43. *See In re Attorney F.*, 285 P.3d 322, 327 (Colo. 2012); *In re Fischer*, 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and underval-

We are mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[44] Though prior cases are helpful by way of analogy, hearing boards must determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

Here, the People ask the Hearing Board to impose a public censure. Respondent himself did not make an argument about the appropriate level of discipline.

The Hearing Board has been unable to identify analogous case law involving a sole violation of Colo. RPC 1.5(b). But a survey of cases involving improper fees—a closely related type of misconduct—suggests that a public censure in this matter would be roughly proportional to sanctions imposed in similar disciplinary cases. For example, in *In re Green*, the Colorado Supreme Court publicly censured a lawyer who charged an unreasonable fee, where four aggravating factors and two mitigating factors were present.[45] A lawyer was suspended for thirty days in *People v. Sather* after he not only charged an unreasonable fee in two instances but also failed to communicate with his clients.[46] The *Sather* court considered evidence of three aggravating factors and four mitigators.[47] Finally, in *In re Wimmershoff*, a lawyer was publicly censured for charging an unreasonable fee, failing to explain the basis of his fee, and violating rules governing contingent fee arrangements, where two aggravators and one mitigator applied.[48] Although the attorney's misconduct in *Wimmershoff* was more extensive than the misconduct in the case at hand, the aggravating factors here predominate to a more significant degree.

In conclusion, the ABA *Standards'* annotation that courts generally censure lawyers who engage in a single instance of charging an improper fee, coupled with Colorado Supreme Court case law, convince the Hearing Board that public censure is warranted.

## IV. *CONCLUSION*

Respondent, a longstanding practitioner, failed to abide by the elementary rule that a lawyer must set forth his or her fee in writing when taking on the representation of a new client. The Hearing Board is unanimous in the view that Respondent should be publicly censured.

## V. *ORDER*

The Hearing Board therefore **ORDERS**:

1. **JOHN W. DALTON**, attorney registration number 06945, is **PUBLICLY CENSURED**. The public censure will take effect upon issuance of an "Order and Notice of Public Censure."[49]

2. The parties **MUST** file any posthearing motion or application for stay pending appeal with the Hearing Board **on or before February 5, 2016.** Any response thereto **MUST** be filed within seven days.

3. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a statement of costs **on or before January 29, 2016.** Any response thereto **MUST** be filed within seven days.

ued the importance of mitigating factors in determining the needs of the public).

**44.** *In re Attorney F.*, 285 P.3d at 327 (quoting *Rosen*, 198 P.3d at 121).

**45.** 11 P.3d 1078, 1089 (Colo.2000).

**46.** 936 P.2d 576, 578–79 (Colo.1997).

**47.** *Id.* at 579.

**48.** 3 P.3d at 418; *see also People v. Wilson*, 953 P.2d 1292, 1293–94 (Colo.1998) (publicly censuring a lawyer who charged an unreasonable fee, violated rules concerning division of fees, and

interfered with the client's right to discharge the lawyer; the opinion noted that a suspension generally would be more appropriate for such misconduct but determined that a public censure would suffice because the lawyer had agreed to comply with substantial mentoring and other conditions).

**49.** In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.